COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present: Judges Petty, Athey and Senior Judge Clements


TARA RAYNE, A/K/A
 ASHLEY CARTER

MEMORANDUM OPINION[*]

v.      Record No. 0879-20-3

PER CURIAM
MARCH 16, 2021

FRANKLIN COUNTY DEPARTMENT
 OF SOCIAL SERVICES


FROM THE CIRCUIT COURT OF FRANKLIN COUNTY
Stacey W. Moreau, Judge

(Tonya L. Janney, on brief), for appellant.

(Carolyn H. Furrow; Melissa P. Keen, Guardian *ad litem* for the
minor child, on brief), for appellee.


Tara Rayne (mother) appeals the circuit court's orders terminating her parental rights to her

child, M.J., and approving the foster care goal of adoption. Mother argues that the circuit court

erred "in affirming the lower court's termination of [her] parental rights in that termination of

parental rights was not in the best interests of the child." She also asserts that the circuit court erred

in denying her request to modify the child protective order which prevented mother from having

contact with M.J. Upon reviewing the record and briefs of the parties, we conclude that this

appeal is without merit. Accordingly, we summarily affirm the decision of the circuit court. See

Rule 5A:27.

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

## BACKGROUND[1]

"On appeal from the termination of parental rights, this Court is required to review the evidence in the light most favorable to the party prevailing in the circuit court." Yafi v. Stafford Dep't of Soc. Servs., 69 Va. App. 539, 550-51 (2018) (quoting Thach v. Arlington Cnty. Dep't of Hum. Servs., 63 Va. App. 157, 168 (2014)).

After mother became pregnant with M.J., she began a relationship with Donald James. Their relationship was often volatile and violent as James threatened and controlled mother. After M.J. was born in 2009, James became more violent.

Despite knowing that James was violent toward her, mother left M.J. in the care of James and his brother. In 2014, the Roanoke City Department of Social Services received allegations of abuse against M.J. It was discovered that M.J. had been sexually molested while in James and his brother's care. Mother explained that she was the one who "was taking most of the beatings" and "being yelled at," so she thought that M.J. "would be safe with Mr. James and his brother." M.J. also had reported that mother hit her with a hairbrush, but mother denied doing so. Mother admitted that she had considered taking M.J. out of school because "she was socializing too much, lying on [mother] and causing CPS to be called." In February 2015, the Roanoke City Juvenile and Domestic Relations District Court entered a child protective order against mother.

---

[1] The record in this case was sealed. Nevertheless, the appeal necessitates unsealing relevant portions of the record to resolve the issues appellant has raised. Evidence and factual findings below that are necessary to address the assignments of error are included in this opinion. Consequently, "[t]o the extent that this opinion mentions facts found in the sealed record, we unseal only those specific facts, finding them relevant to the decision in this case. The remainder of the previously sealed record remains sealed." Levick v. MacDougall, 294 Va. 283, 288 n.1 (2017).

In addition, Donald and Mattie Beeghley were granted custody of M.J., who was five years old at the time.[2]

Mother had three younger children and feared for her and her children's safety. She began to have suicidal ideations. In 2016, mother signed entrustment agreements for the three younger children, and her parental rights to those three children were terminated.

In 2017, mother "rekindled" her relationship with James because he had promised her that she could visit M.J. James lied to Mrs. Beeghley about his relationship with mother, so Mrs. Beeghley would allow M.J. to visit. In March 2017, James and mother started fighting in front of M.J., and M.J. "had freaked out on the steps." Mother called Mrs. Beeghley and told her that she and James were living together. Mrs. Beeghley picked up M.J. After James left mother in January 2018, mother did not visit with M.J.

Mother reported that she believed that James intended to harm her even though they were no longer living together. As a result, she legally changed her name and moved frequently.

Meanwhile, M.J.'s behavior became very aggressive, and the Beeghleys became unable to care for M.J. On April 9, 2019, the Beeghleys relinquished custody of then-ten-year-old M.J., who entered foster care. The Franklin County Department of Social Services (the Department) could not locate mother at the time of the removal. James later told mother that M.J. was in foster care. Once mother found out, she contacted the Department and subsequently called the social worker periodically to check on M.J.

Mother had filed motions to amend custody and visitation and a motion to modify the protective order. On February 5, 2020, the Franklin County Juvenile and Domestic Relations District Court (the JDR court) entered an order disapproving the foster care goal of relative

---

[2] The Beeghleys were believed to have been M.J.'s paternal great-grandparents; however, it was later determined that they were not biologically related.

placement and denying mother's motions to modify the protective order and amend custody and visitation. On May 20, 2020, the JDR court terminated mother's parental rights to M.J. Mother appealed the JDR court's rulings.

On July 9, 2020, the parties appeared before the circuit court. Pursuant to the parties' agreement, the Department proffered its evidence. M.J. had not lived with mother since she was five years old, and at the time of the circuit court hearing, M.J. was eleven years old. Aside from seeing M.J. after court in February or March 2020, mother had not seen M.J. since 2018. In April 2020, M.J. was hospitalized for psychiatric care. M.J. was diagnosed with attention deficit hyperactivity disorder, reactive attachment disorder, and post-traumatic stress disorder. In addition, M.J. is on the autism spectrum and "mildly intellectually disabled." At the time of the circuit court hearing, M.J. was residing at a treatment center and attending school there. M.J. was doing well at the treatment center; however, M.J. was "prone to aggression and extremely disruptive behavior," despite her medication.

Mother testified that she wanted custody of M.J. and to be a part of her life. Mother admitted that she had moved "quite a bit" to flee James, and as a result, she had been unable to secure the necessary appointments to comply with the Department's requirements. Mother testified that at the time of the circuit court hearing, she was living with a friend, who also was her employer, and mother was caring for her friend's children who had special needs. Mother hoped to be able to move into a three-bedroom trailer with two bathrooms.

Mother testified that she had been diagnosed with fibromyalgia, epilepsy, lupus, asthma, post-traumatic stress disorder, manic depression disorder, and suicidal ideations. At the time of the circuit court hearing, mother had scheduled appointments, but had not met, with a new counselor and psychiatrist. She explained that she had not seen a doctor for several months due to the pandemic, but she had continued to take her medications.

- 4 -

After hearing the evidence and arguments, the circuit court terminated mother's parental rights to M.J. and approved the foster care goal of adoption. The circuit court also denied mother's motions to amend the protective order and modify custody and visitation. This appeal followed.

## ANALYSIS

### *Termination of parental rights*

Mother argues that the circuit court erred in "affirming the lower court's termination of [her] parental rights in that termination of parental rights was not in the best interests of the child." Mother asserts that she could care for M.J. and her special needs. She emphasizes that she had a job caring for children with special needs.

"On review, '[a] trial court is presumed to have thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" Castillo v. Loudoun Cnty. Dep't of Fam. Servs., 68 Va. App. 547, 558 (2018) (quoting Logan v. Fairfax Cnty. Dep't of Hum. Dev., 13 Va. App. 123, 128 (1991)). "Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." Fauquier Cnty. Dep't of Soc. Servs. v. Ridgeway, 59 Va. App. 185, 190 (2011) (quoting Martin v. Pittsylvania Cnty. Dep't of Soc. Servs., 3 Va. App. 15, 20 (1986)).

The circuit court terminated mother's parental rights under Code § 16.1-283(C)(1) and (C)(2). "When addressing matters concerning a child, including the termination of a parent's residual parental rights, the paramount consideration of a trial court is the child's best interests." Tackett v. Arlington Cnty. Dep't of Hum. Servs., 62 Va. App. 296, 319 (2013) (quoting Logan, 13 Va. App. at 128).

The evidence proved that M.J. had not lived with mother since she was five years old, and at the time of the circuit court hearing, M.J. was eleven years old. The circuit court found that mother had "not been actively involved in [M.J.'s] life." Other than seeing M.J. after a court hearing in early 2020, mother had not had contact with M.J. since 2018. When M.J. entered foster care, the Department could not locate mother, and mother did not learn that M.J. was in foster care for several months. Mother admitted that she did not complete the Department's requirements for reunification.

At the time of the circuit court hearing, M.J. had been in foster care for approximately fifteen months. She had serious mental health problems that required hospitalization in April 2020. M.J. was in a residential treatment center, and there was evidence that she was expected to remain there for several months.

Mother testified about her volatile relationship with James. The circuit court found that mother "did not remove herself" from the abusive relationship, as there was evidence that she resumed her relationship with James in 2017. The circuit court also found that mother had "significant health issues," was "not self sufficient," and had "moved numerous times." The circuit court found that mother had "not been able, ha[d] not followed through on her evaluations and what she ha[d] been recommended to do in working to complete the foster care services that ha[d] been offered to her."

Moreover, the circuit court was concerned about mother's "significant" history with child protective services and noted that her parental rights to three other children had been terminated. The circuit court found that mother could not take care of herself and did not have "stable living." Mother was not in a position to care for M.J., especially considering M.J.'s special needs. "It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities."

Id. at 322 (quoting Kaywood v. Halifax Cnty. Dep't of Soc. Servs., 10 Va. App. 535, 540 (1990)). The circuit court did not err in terminating mother's parental rights and finding that termination was in M.J.'s best interests.

*Child protective order*

During closing arguments, mother asked the circuit court to deny the petition to terminate her parental rights, or "[i]n the alternative if [the court] were to grant that petition, [mother] would ask that [the court] allow [her] to have contact with [M.J.]." As discussed above, the circuit court terminated mother's parental rights and denied mother's motion to amend the child protective order.

Mother argues that the circuit court erred in denying her motion to amend the child protective order. Mother contends that the circuit court's denial was "plainly . . . wrong" because the Department "never argued that contact between [mother] and MJ [was] not in MJ's best interests" and the circuit court "gave no explanation" for its denial of her motion.

Mother has the burden of showing that reversible error was committed. See Alwan v. Alwan, 70 Va. App. 599, 612 (2019). Rule 5A:20(e) mandates that an appellant's opening brief include "[t]he standard of review and the argument (including principles of law and authorities) relating to each assignment of error." Although mother provided the standard of review, she offered no legal authority to support her arguments that the circuit court erred in denying her motion to modify the child protective order. Accordingly, mother did not comply with Rule 5A:20(e) because her opening brief does not contain any principles of law or citation to legal authorities to fully develop her arguments.

Moreover, "[w]hen a court terminates a parent's parental rights, the parent is divested of all legal relations to the child, and the parent has no legal right to even communicate or visit that child." Haugen v. Shenandoah Valley Dep't of Soc. Servs., 274 Va. 27, 34 (2007). "'When a

court orders termination of parental rights, the ties between the parent and child are severed forever, and the parent becomes "a legal stranger to the child."'" <u>Id.</u> at 35 (quoting <u>Lowe v. Dep't of Pub. Welfare of the City of Richmond</u>, 231 Va. 277, 280 (1986)). After the circuit court terminated mother's parental rights to M.J., mother no longer had the "legal right" to have contact with M.J. <u>Id.</u> at 34. Thus, the circuit court did not err in denying mother's motion to amend the child protective order.

CONCLUSION

For the foregoing reasons, the circuit court's ruling is summarily affirmed. Rule 5A:27.

<u>Affirmed.</u>